# EXHIBIT A

**SALTZ MONGELUZZI & BENDESKY P.C.**
BY: ELIZABETH A. BAILEY
ONE LIBERTY PLACE, 52ND FLOOR
1650 MARKET STREET
PHILADELPHIA, PA 19103
(215) 496-8282

**COHEN & MALAD, LLP**
BY: LYNN TOOPS/MARY KATE DUGAN
*PRO HAC VICE PENDING*
ONE INDIANA SQUARE, SUITE 1400
INDIANAPOLIS, IN 46204
(317) 636-6481

**TURKE & STRAUSS LLP**
BY: RAINA C. BORRELLI/SAMUEL J. STRAUSS
*PRO HAC VICE PENDING*
613 WILLIAMSON STREET, SUITE 201
MADISON, WI 53703
(608) 237-1775

**STRANCH, JENNINGS & GARVEY, PLLC**
J. GERARD STRANCH, IV/ANDREW E. MIZE
*PRO HAC VICE PENDING*
223 ROSA L. PARKS AVENUE, SUITE 200
NASHVILLE, TN 37203
(615) 254-8801                                           **Attorneys for Plaintiff**

*Filed and Attested by the Office of Judicial Records 26 MAY 2023 11:23 am G. IMPERATO*

### IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

| | | |
|---|---|---|
| **JANE DOE, Individually, and on behalf of all others similarly situated,** | ) ) ) | |
| **Plaintiff** | ) ) | Case No. _____ |
| **v.** | ) ) | |
| **REPRODUCTIVE MEDICINE ASSOCIATES OF PHILADELPHIA, P.C.** | ) ) ) | JURY TRIAL DEMANDED |
| **Defendant** | ) ) | |

1

Case ID: 230502846

<table>
<tr><td>

*NOTICE*

*You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by  entering a written appearance personally or by an attorney and filing in writing with the court your  defenses or objections to the claims set forth against you.

You are warned that if you fail to do so the case may  proceed without you and a judgement may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

*YOU SHOULD TAKE THIS PAPER TO YOUR  LAWYER AT ONCE.  IF YOU  DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL and INFORMATION SERVICE
One Reading Center
Philadelphia, Pennsylvania 19107
(215) 238-1701*

</td><td>

*AVISO*

*Le han demandado en corte.  Si usted quiere defenderse contra las demandas nombradas en las páginas siguientes, tiene veinte (20) días, a partir de recibir esta  demanda y la notification para entablar personalmente o por un abogado una comparecencia escrita y tambien para entablar con la corte en forma escrita sus defensas y objeciones a las demandas contra usted.

Sea avisado que si usted no se defiende, el caso puede continuar sin usted y la corte puede incorporar un juicio contra usted sin previo aviso para conseguir el dinero demandado en el pleito o para conseguir culquier otra demanda o alivio solicitados por el demandante.  Usted puede perder dinero o propiedad u otros derechos importantes para usted.

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE.  SI USTED NO TIENE ABOGADO (O NO TIENE DINERO SUFICIENTE PARA PARGAR A UN ABOGADO), VAYA EN PERSONA O LLAME  POR TELEFONO LA OFICINA NOMBRADA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASSISTENCIA LEGAL.  ESTA OFICINA PUEDE PROPORCIONALE LA INFORMACION SOBRE CONTRATAR A UN ABOGADO.

SI USTED NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO, ESTA OFICINA PUEDE PROPORCIONALE INFORMACION SOBRE AGENCIAS QUE OFRECEN SERVICIOS LEGALES A PERSONAS QUE CUMPLEN LOS REQUISITOS PARA UN HONORARIO REDUCIDO O NINGUN HONORARIO.

ASSOCIACION DE LICENCIADOS DE FILADELFIA
SERVICO DE REFERENCA E INFORMACION LEGAL
One Reading Center,
Filadelfia, Pennsylvania 19107
Telefono: (215) 238-1701*

</td></tr>
</table>

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff, JANE DOE, Individually, and on behalf of all others similarly situated (hereinafter "Plaintiff") brings this Class Action Complaint against Defendant, REPRODUCTIVE MEDICINE ASSOCIATES OF PHILADELPHIA, P.C. (hereinafter "RMA" or "Defendant"), and alleges, upon personal knowledge as to her own actions, and upon information and belief as to all other matters, as follows:

### INTRODUCTION

1.      Plaintiff brings this class action to address Defendant's outrageous, illegal, and widespread practice of disclosing the confidential Personally Identifying Information[1] and/or

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

Case ID: 230502846

Protected Health Information[2] (collectively referred to as "Private Information") of Plaintiff and the proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"), Google, LLC ("Google"), Microsoft Corp. ("Microsoft"), AppNexus, Hotjar, Arttrk.com, TradeDesk, and possibly others. ("the Disclosure").

2.      Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace and denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system.

3.      Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, <u>no</u>

---

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). RMA is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.

Case ID: 230502846

health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

4.      RMA is a Pennsylvania healthcare provider, rendering reproductive medical care services[3] throughout Pennsylvania, including in the Philadelphia area, in King of Prussia, Pennsylvania, Langhorne, and in Abington, Pennsylvania.[4]

5.      Defendant encourages its patients to use its website, found at URLs https://rmapa.com[5], https://rmanetwork.com/, and https://rmanetwork.com/our-locations/rma-philadelphia/ (the "Website"), and various web-based tools and services to search for physicians, locate healthcare facilities, learn about specific health conditions and treatment services options, and more (collectively referred to as the "Online Platforms").

6.      Despite its unique position as a massive and trusted healthcare provider, RMA knowingly configured and implemented into its Website devices known as "pixels," which then collected and transmitted patients' information to third parties. This included information and communicated by patients through Defendant's sensitive and presumptively confidential Online Platforms.

7.      When Plaintiff and Class Members used Defendant's Online Platforms, they thought were communicating exclusively with their trusted healthcare provider. Unbeknownst to them, Defendant embedded pixels from Facebook, Google, Microsoft and others into its Online Platforms, surreptitiously forcing Plaintiff and Class Members to transmit intimate details about their medical treatment to third parties.

8.      A pixel (also referred to as a "tracker" or "tracking technology") is a snippet of

---

[3] *See* RMA website, available at https://rmanetwork.com/our-locations/rma-philadelphia/; https://rmanetwork.com/treating-infertility/ (last accessed May 22, 2023).
[4] https://rmanetwork.com/our-locations/rma-philadelphia/;
[5] https://rmapa.com automatically redirects to https://rmanetwork.com/

Case ID: 230502846

code embedded into a website that tracks information about its visitors and their website interactions.[6] When a person visits a website with an embedded pixel, the pixel tracks "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted.[7] Then, the pixel transmits the event information back to the website server and to third parties, where it can be combined with other data and used for marketing.[8]

9.    Among the pixels Defendant embedded into its Website and Online Platforms is the Facebook Pixel (also referred to as the "Meta Pixel" or "Pixel"). By default, the Meta Pixel tracks information about a visitor's device, including their IP address, and the pages viewed.[9] When configured, the Meta Pixel can track much more, including a visitor's search terms, button clicks, and form submissions.[10] Additionally, the Meta Pixel can link a visitor's website interactions with an individual's unique and persistent Facebook ID ("FID"), allowing a user's health information to be linked with their Facebook profile.[11]

10.    Operating as designed and as implemented by Defendant, the Meta Pixel allowed Defendant to unlawfully disclose Plaintiff and Class Members' Private Health Information alongside identifying details to Facebook. By installing the Meta Pixel on its Website, Defendant effectively planted a bug on Plaintiffs' and Class Members' web browsers and compelled them to

---

[6] See Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[7] See Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).
[8] Id.
[9] See Get Started, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 22, 2023).
[10] See Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).
[11] The Meta Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." What are Cookies?, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

Case ID: 230502846

disclose Private Information and confidential communications to Facebook without their authorization or knowledge.

11.    In addition to its use of the Meta Pixel to spy on and transmit Plaintiff's and Class Members' Private Information, Facebook encourages and recommends use of its Conversions Application Programming Interface ("CAPI").[12]

12.    Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including Private Information, records and stores that information on the website owner's servers, and then transmits the data to Facebook from the website owner's servers.[13, 14]

13.    Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[15]

14.    Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Meta Pixel from sending website users' Private Information to Facebook directly.

---

[12] "CAPI works with your Meta Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir El Kamouny, How to Implement Facebook Conversions API (In Shopify), FETCH & FUNNEL https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Jan. 25, 2023).

[13] What is the Facebook Conversion API and How to Use It, REVEALBOT BLOG, https://revealbot.com/blog/facebook-conversions-api/ (last updated May 20, 2022).

[14] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." Conversions API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api (last visited May 15, 2023).

[15] About Conversions API, META FOR DEVELOPERS, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).

Case ID: 230502846

15.     Defendant utilized data from these trackers to market its services and bolster its profits. Meta Pixel and CAPI are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting and future marketing. Facebook also uses Plaintiff's and Class Members' Private Information to create targeted advertisements based on the medical conditions and other information disclosed to Defendant.

16.     Such information allows a third party (e.g., Facebook) to know that a specific patient was seeking confidential medical care. Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers, who then geotarget Plaintiff's and Class Members' Facebook pages based on communications obtained via the Meta Pixel and CAPI. Facebook and any third-party purchasers of Plaintiff's and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

17.     In addition to the Facebook tracker and CAPI, Defendant installed other tracking technology, including Google Tag Manager, Microsoft Clarity, AppNexus, Hotjar, Arttrk.com, and Trade Desk. On information and belief, these trackers operate similarly to the Meta Pixel and transmit a website user's Private Information to other third parties.

18.     Healthcare patients simply do not anticipate that their trusted healthcare provider will send Personal Health Information or other confidential medical information collected via its webpages to a hidden third party—let alone Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without the patients' consent.

19.     Neither Plaintiff nor any Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook, Google, Microsoft, AppNexus, Hotjar, Arttrk.com, and Trade Desk, or any other third parties uninvolved in their treatment.

7

Case ID: 230502846

20.     Despite willfully and intentionally incorporating tracking technology, including the Meta Pixel, potentially CAPI, and other tracking technology, into its Website and servers, RMA has never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private Information with third parties including Facebook, and possibly Google, Microsoft, AppNexus, Hotjar, Arttrk.com, Trade Desk, and others.

21.     Plaintiff and Class Members were unaware that their Private Information was being surreptitiously transmitted to Facebook and other third parties as they communicated their confidential PHI with their healthcare provider via the Website.

22.     Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant.

23.     Defendant owed common law, statutory, and regulatory duties to keep Plaintiff's and Class Members' communications and Private Information safe, secure, and confidential.

24.     Upon information and belief, RMA utilized the Meta Pixel and other tracker data to improve and to save costs on its marketing campaigns, improve its data analytics, attract new patients, and generate sales.

25.     Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

26.     Defendant breached its statutory and common law obligations to Plaintiff and Class Members by, *inter alia*,: (i) failing to adequately review its marketing programs and web based technology to ensure the hospital Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) aiding, agreeing,

8

Case ID: 230502846

and conspiring with third parties to intercept communications sent and received by Plaintiff and Class Members; (iv) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook and others; (v) failing to protect Private Information and take steps to block the transmission of Plaintiff's and Class Members' Private Information through the use of Meta Pixel and other tracking technology; (vi) failing to warn Plaintiff and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

27.     Plaintiff seeks to remedy these harms and brings causes of action for (I) Negligence, (II) Invasion of Privacy—Intrusion Upon Seclusion, (III) Breach of Implied Contract, (IV) Unjust Enrichment; (V) Breach of Fiduciary Duty, (VI) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 20101 *et. seq.*, and (VII) Violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701 et seq., ("WESCA").

## PARTIES

28.     Plaintiff, JANE DOE, is a natural person and a resident and citizen of the Commonwealth of Pennsylvania, where she intends to remain, with a principal residence in Philadelphia, Pennsylvania, Philadelphia County. She is a patient or former patient of RMA and a victim of Defendant's unauthorized Disclosure of Private Information.

29.     Defendant RMA is a professional corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 625 Clark Avenue, Suite 17b, King of Prussia, Pennsylvania 19406 in Montgomery County, Pennsylvania, and which conducts business in Philadelphia County.

## JURISDICTION AND VENUE

9

Case ID: 230502846

30.     This Court has jurisdiction over the subject matter of this action pursuant to 42 Pa. Cons. Stat. § 931.

31.     This Court has personal jurisdiction over Defendant pursuant to 42 Pa. Cons. Stat. § 5301, because Defendant is incorporated under the laws of this Commonwealth and maintains a principal place of business herein.

32.     Venue is appropriate in this Court under 231 Pa. Code § 2179, because Defendant conducts business in Philadelphia County.

<strong>COMMON FACTUAL ALLEGATIONS</strong>

**A. Background**

33.     RMA is a Pennsylvania healthcare provider, a "leader[] in reproductive medicine," which provides fertility medical treatment, including In Vitro Fertilization (IVF), Intrauterine Insemination (IUI), Ovulation Induction Treatment, blastocyst embryo IVF, Single Embryo Transfer, Frozen Embryo Transfer (FET), Genetic Testing (PGT-A), Intracytoplasmic Sperm Injection (ICSI), Fertility Preservation, and Third Party Reproduction services[16] to patients throughout Pennsylvania.

34.     RMA "has four fertility clinics in the greater Philadelphia area and one state-of-the-art IVF laboratory," with its offices in "King of Prussia, Langhorne, Abington, and center city Philadelphia, offer[ing] a full range of fertility services, including IVF, IUI, and third-party reproductive services."[17]

35.     RMA serves many of its patients via its Online Platforms, which it encourages patients to use to find healthcare services and providers, access information about specific health

---

[17] https://rmanetwork.com/our-locations/rma-philadelphia/;

Case ID: 230502846

conditions, request appointments, and more.[18]

36.    Defendant promotes the convenience and comprehensive functionality of its Online

Platforms and Defendant encourages its patients to use its Online Platforms.

37.    In furtherance of that goal, and to increase the success of its advertising and

marketing and sales, Defendant purposely installed the Meta Pixel and trackers on its Website and

Online Platforms. In doing so, Defendant surreptitiously shared patients' private and protected

communications, including those containing Plaintiff's and Class Members' Private Information,

with Facebook and other third parties.

38.    To better understand Defendant's unlawful data-sharing practices, a brief

discussion of basic web design and tracking tools follows.

### i.    *Facebook's Business Tools and the Meta Pixel*

39.    As Facebook operates the world's largest social media company and generated

$117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising

space.[19]

40.    In conjunction with its advertising business, Facebook encourages and promotes

entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify,

target, and market products and services to individuals.

41.    Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits

of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby

---

[18] See generally, https://rmanetwork.com/our-locations/rma-philadelphia/
[19] Meta Reports Fourth Quarter and Full Year 2021 Results, FACEBOOK  https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Nov. 14, 2022).

Case ID: 230502846

enabling the interception and collection of user activity on those platforms.

42.    The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, the webpage's Universal Resource Locator ("URL"), as well as metadata, button clicks, and other information.[20] Businesses that want to target customers and advertise their services, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[21]

43.    One such Business Tool is the Meta Pixel, a tool that "tracks the people and type of actions they take."[22] When a user accesses a webpage that is hosting the Meta Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook—traveling from the user's browser to Facebook's server.

44.    Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate patient privacy (such as the homepage) and disable it on pages that do implicate patient privacy (such as the "Request an Appointment" page).

45.    The Meta Pixel's primary purpose is for marketing and ad targeting and sales generation.[23]

46.    Facebook's own website informs companies that "[t]he Meta Pixel is a piece of

---

[20]Specifications for Facebook Pixel Standard Events, META, https://www.facebook.com/business/help/402791146561655 (last visited Jan. 31, 2023); see also Facebook Pixel, Accurate Event Tracking, Advanced, META FOR DEVELOPERS; https://developers.facebook.com/docs/facebook-pixel/advanced/; see also Best Practices for Facebook Pixel Setup, META https://www.facebook.com/business/help/218844828315224; App Events API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Jan. 31, 2023).
[21] About Standard and Custom Website Events, META, https://www.facebook.com/business/help/964258670337005; see also Facebook, App Events API, supra.
[22] Retargeting, META, https://www.facebook.com/business/goals/retargeting.
[23] See Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).

Case ID: 230502846

code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[24]

47.    According to Facebook, the Meta Pixel can collect the following data.

**Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and ***person using the website.*** (emphasis added).

**Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[25]

48.    Facebook boasts to its prospective users that the Meta Pixel can be used to:

- **Make sure your ads are shown to the right people.** Find new customers, or people who have visited a specific page or taken a desired action on your website.

- **Drive more sales**. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

- **Measure the results of your ads.** Better understand the impact of your ads by measuring what happens when people see them.[26]

49.    Facebook likewise benefits from the data received from the Meta Pixel and uses the data to serve targeted ads and identify users to be included in such targeted ads.

---

[24] About Meta Pixel, META,
https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).
[25] Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[26] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).

Case ID: 230502846

ii. **Defendant's method of transmitting Plaintiff's and Class Members' Private Information via the Meta Pixel and/or Conversions API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Meta Pixel**

50.     Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

51.     Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

52.     Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.[27]

53.     GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.

54.     When an individual visits a website, their web browser sends an HTTP Request to the entity's servers that essentially asks the website to retrieve certain information (such as Defendant's "Find a Doctor" page). The entity's servers send the HTTP Response, which contains the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate a website.

_____

[27]"Cookies are small files of information that a web server generates and sends to a web browser . . . . Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

Case ID: 230502846

55.     Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

56.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

57.     Defendant's implementation of the Meta Pixel is source code that acted much like a traditional wiretap, intercepting and transmitting communications intended only for Defendant.

58.     Separate from the Meta Pixel, Facebook and other website owners can place third-party cookies in the web browsers of users logged into their websites or services. These cookies can uniquely identify the user so the cookie owner can track the user as she moves around the internet—whether on the cookie owner's website or not. Facebook uses this type of third-party cookie when Facebook account holders use the Facebook app or website. As a result, when a Facebook account holder uses Defendant's Website, the account holder's unique Facebook ID is sent to Facebook, along with the intercepted communication, allowing Facebook to identify the patient associated with the Private Information it has intercepted.

59.     With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. To counteract this, third parties bent on gathering data and Private Information implement workarounds that are difficult to detect or evade. Facebook's workaround is its Conversions API tool, which is particularly effective because the data transmitted via this tool does not rely on the website visitor's web browsers. Rather, the information travels directly from the entity's server to Facebook's server.

60.     Conversions API "is designed to create a direct connection between [web hosts']

15

marketing data and [Facebook]."[28] Thus, the entity receives and stores its communications with patients on its server before Conversions API collects and sends those communications—and the Private Information contained therein—to Facebook.

61.    Notably, client devices do not have access to host servers and thus cannot prevent (or even detect) this additional transmission of information to Facebook.

62.    While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the host server, Facebook instructs companies like Defendant to "[u]se the Conversions API in addition to the Meta Pixel, and share the same events using both tools," because such a "redundant event setup" allows the entity "to share website events [with Facebook] that the pixel may lose."[29]  Thus, if an entity implemented the Meta Pixel in in accordance with Facebook's documentation, it is also reasonable to infer that it implemented the Conversions API tool on its Website.

63.    The third parties to whom a website transmits data through pixels and other tracking technology do not provide any substantive content on the host website. In other words, Facebook and others like it are not providing anything to the user relating to the user's communications. Instead, these third parties are typically procured to track user data and communications only to serve the marketing purposes of the website owner (i.e., to bolster profits).

64.    Accordingly, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer its patients' computing devices, causing the device's web browser to contemporaneously and invisibly re-direct the patients' communications to hidden third parties like Facebook.

---

[28] About Conversions API, META, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).
[29] See Best Practices for Conversions API, META, https://www.facebook.com/business/help/308855623839366 (last visited May 15, 2023).

Case ID: 230502846

65.    In this case, Defendant employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

66.    Consequently, when Plaintiff and Class Members visited Defendant's website and communicated their Private Information, it is simultaneously intercepted and transmitted to Facebook.

67.    RMA also employed other trackers, including AppNexus, Microsoft Clarity, Google Tag Manager, Hotjar, Arttrk.com, and TradeDesk, which, on information and belief, likewise transmitted Plaintiff's and the Class Members' Private Information to third parties without Plaintiff's and Class Members' knowledge or authorization.

### iii.    Defendant Violated its own Privacy Policies

68.    RMA maintains and is covered under a "www.rmanetwork.com HIPAA Notice of Privacy Practices" ("Notice of Privacy Practices").[30]

69.    Defendant's Notice of Privacy Practices provides, "THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY." [31]

> In the Notice of Privacy Practices, RMA acknowledges its responsibilities to: "maintain the privacy and security of your protected health information[; to] let you know promptly if a breach occurs that may have compromised the privacy or security of your information[; to] follow the duties and privacy practices described in this notice and give you a copy of it[; and, to] not use or share your information, other than as described here, unless you tell us we can in writing.[32]

---

[30] RMA "www.rmanetwork.com HIPAA Notice of Privacy Practices" available at https://rmanetwork.com/wp-content/uploads/2022/04/PHL-HIPAA-2022.pdf (last accessed May 22, 2023), **attached as Exhibit A.**
[31] *Id.* (capitalization in original)
[32] *Id.*

Case ID: 230502846

70.     RMA's Notice of Privacy Practices represents and promises, "[i]n these cases we never share your information unless you give us written permission: • Marketing purposes • Sale of your information […]"[33]

71.     On information and belief, RMA does not presently post a separate privacy policy applicable to the use of its Website which is accessible by site visitors.[34]

72.     *However*, previously, as of April 23, 2023, approximately, RMA maintained an online Privacy Policy applicable to the use of its Website ("Online Privacy Policy").[35]

RMA's Online Privacy Policy provided:

This notice discloses the privacy practices for RMA Network - Fertility Clinic. This privacy notice applies solely to information collected by this website. It will notify you of the following:

1.  What personally identifiable information is collected from you through the website, how it is used and with whom it may be shared.
2.  What choices are available to you regarding the use of your data.
3.  The security procedures in place to protect the misuse of your information.
4.  How you can correct any inaccuracies in the information.[36]

73.     Further, RMA's Online Privacy Policy represents and promises:

Information Collection, Use, and Sharing

We are the sole owners of the information collected on this site. We only have access to/collect information that you voluntarily give us via email or other direct contact from you. We will not sell or rent this information to anyone.
We will use your information to respond to you, regarding the reason you contacted us. **We will not share your information with any third party outside of our organization, other than as necessary to fulfill your request, e.g. to ship an order.**

Unless you ask us not to, we may contact you via email in the future to tell you about specials, new products or services, or changes to this privacy policy.[37]

---

[33] *Id.*
[34] *See* RMA https://rmanetwork.com/privacy-policy/
[35] *See* "Privacy Policy," attached as **Exhibit B**, and formerly available at https://rmanetwork.com/privacy-policy/ (accessed via Wayback Machine, May 22, 2023).
[36] *Id.*
[37] *Id.* (bold emphasis added).

Case ID: 230502846

74.    Further still, RMA's Online Privacy Policy, under "Security," states:

Security

**We take precautions to protect your information. When you submit sensitive information via the website, your information is protected both online and offline.**

Wherever we collect sensitive information (such as credit card data), that information is encrypted and transmitted to us in a secure way. You can verify this by looking for a lock icon in the address bar and looking for "https" at the beginning of the address of the Web page.

While we use encryption to protect sensitive information transmitted online, we also protect your information offline. **Only employees who need the information to perform a specific job (for example, billing or customer service) are granted access to personally identifiable information. The computers/servers in which we store personally identifiable information are kept in a secure environment.**[38]

75.    Despite the representations in its Notice of Privacy Practices and Online Privacy Policy, RMA does indeed transfer Private Information to third parties. An example illustrates the point. If a patient visits Defendant's Website and looks for a doctor, for a service, or searches for a term, e.g., "anxiety," the individual's browser sends a request to Defendant's server requesting that it load the webpage. Then, Meta Pixel sends secret instructions back to the individual's browser, causing it to imperceptibly record the patient's communication with RMA and transmit it to Facebook's servers alongside personally identifying information, such as the patient's IP address. Thus, any Website page a patient visits is then reported back to Facebook, alongside personally identifying information about that patient.

76.    Google and other companies likewise process this data in a similar manner and use it to connect the information to particular individuals to build marketing and other data profiles.

---

[38] *Id.* (bold emphasis added).

19

Case ID: 230502846

77.    In this way, Defendant unlawfully disclosed Plaintiffs' and Class Members' confidential communications and Private Information to Facebook and possibly others without authorization or proper de-identification, in violation its own Notice of Privacy Practices and Online Privacy Policy.

78.    Additionally, Defendant misrepresented that it would preserve the confidentiality of Plaintiff's and Class Members' Private Information and the anonymity of their identities.

79.    Through the use of Meta Pixel and other trackers, Defendant RMA shares its patients' identities and online activity, including personal information and search results related to their private medical treatment, with Facebook and possibly other third parties.

80.    Defendant could have chosen not to use the Meta Pixel and other tracking technology or could have configured its trackers to limit the information that it communicated to third parties, but it did not. Instead, it intentionally took advantage of these trackers' features and functions, resulting in the Disclosure of Plaintiff's and Class Members' Private Information.

81.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant RMA to disclose their Private Information or intercept their communications. Plaintiff was never provided with any written notice that Defendant discloses its patients' Protected Health Information, nor were they provided any means of opting out of such disclosures. Defendant nonetheless knowingly disclosed Plaintiff's Protected Health Information to Facebook and possibly other unauthorized entities.

82.    Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.

83.    By law, Plaintiff and the Class Members are entitled to privacy in her and their

Case ID: 230502846

Protected Health Information and confidential communications. RMA deprived Plaintiff and Class Members of their privacy rights when it (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential communications, Personally Identifiable Information, and Protected Health Information; (2) disclosed patients' Private Information to unauthorized, third-party eavesdroppers, including Facebook and possibly others; and (3) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

### B. Plaintiff's Experience

84.    Plaintiff Jane Doe has been a patient of Defendant since July 2022. She has received healthcare services from RMA and physicians in RMA's network at its Abington, Pennsylvania and Philadelphia, Pennsylvania locations.

85.    Plaintiff accessed Defendant's Online Platforms at Defendant's direction and encouragement. Plaintiff reasonably expected that her online communications with RMA were confidential, solely between herself and RMA, and that, as such, those communications would not be transmitted to or intercepted by a third party.

86.    Plaintiff provided her Private Information to Defendant and trusted that the information would be safeguarded according to RMA's privacy policies and the law.

87.    As described herein, by use of the Meta Pixel and other tracking technology, RMA sent Plaintiff's Private Information to Facebook, and possibly others, when she used Defendant's Online Platforms to communicate healthcare and identifying information to RMA.

88.    Pursuant to the process described herein, RMA assisted Facebook, Microsoft, and others, with intercepting her communications, including those that contained PII, PHI, and related confidential information. RMA facilitated these interceptions without Plaintiff's knowledge,

Case ID: 230502846

consent, or express written authorization.

89.     By failing to receive the requisite consent, RMA breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

**C.  Investigations and Reports Reveal the Meta Pixel's Impermissible Collection of PHI**

90.     In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[39] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

91.     On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data.  The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway.  The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective . . . at preventing the receipt of sensitive data."[40]

92.     The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data was not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data.  In that case, the

---

[39] Kurt Wagner & Bloomberg, Facebook Admits Another Blunder with User Data, FORTUNE (July 1, 2020 at 6:30 p.m.) https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/.
[40] New York State Department of Financial Services, REPORT ON INVESTIGATION OF FACEBOOK INC. DATA PRIVACY CONCERNS, (Feb. 18, 2021)
https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.

Case ID: 230502846

more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[41] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[42]

93.    More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[43]

94.    Furthermore, in June 2022, an investigation by The Markup[44] revealed that the Meta Pixel was embedded on the websites of 33 of the top 100 hospitals in the nation.[45] On those hospital websites, the Meta Pixel collects and sends Facebook a "packet of data," including sensitive personal health information, whenever a user interacts with the website, for example, by clicking

---

[41] Justin Sherman, Your Health Data Might Be for Sale, SLATE (June 22, 2022 at 5:50 a.m.) https://slate.com/technology/2022/06/health-data-brokers-privacy.html.
[42] Id.
[43] Lorenzo Franceschi-Bicchierai, Facebook Doesn't Know What It Does with Your Data, or Where It Goes: Leaked Document, VICE (April 26, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.
[44] The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change our society. See www.themarkup.org/about (last accessed Mar. 19, 2023).
[45] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, Facebook Is Receiving Sensitive Medical Information from Hospital Websites, THE MARKUP (June 16, 2022 6:00 a.m.) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

Case ID: 230502846

a button to schedule a doctor's appointment.[46] The data is connected to an IP address, which is "an identifier that's like a computer's mailing address and can generally be linked to a specific individual or household—creating an intimate receipt of the appointment request for Facebook."[47]

95.     During its investigation, The Markup found that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[48]

96.     In addition to the 33 hospitals identified by The Markup that had installed the Meta Pixel on their websites, The Markup identified seven health systems that had installed the Meta Pixel inside their password-protected patient portals.[49]

97.     David Holtzman, health privacy consultant and former senior privacy adviser in the U.S. Department of Health and Human Services' Office for Civil Rights, stated he was "deeply troubled" by what the hospitals capturing and sharing patient data in this way.[50]

**D.  Defendant Violated HIPAA Standards**

98.     Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[51]

99.     Guidance from the United States Department of Health and Human Services

---

[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

Case ID: 230502846

instructs healthcare providers that patient status alone is protected by HIPAA.

100.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[52]

101.    In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[53]

102.    In addition, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) has issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology.[54]

---

[52] U.S. Department of Health and Human Services, Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, (Nov. 26, 2012) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[53] U.S. Department of Health and Human Services, Marketing, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[54] *See* U.S. Department of Health and Human Services, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.

Case ID: 230502846

103.    According to the Bulletin, "HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information."[55]

104.    Citing The Markup's June 2022 article, the Bulletin expressly notes:

Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.[56]

105.    In other words, HHS has expressly stated that Defendant's conduct of implementing the Meta Pixel is a violation of HIPAA Rules.

**E. Defendant Violated Industry Standards**

106.    A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

107.    The American Medical Association's ("AMA") Code of Medical Ethics contains

---

[55] *Id.*

[56] *Id.* (emphasis in original) (internal citations omitted).

Case ID: 230502846

numerous rules protecting the privacy of patient data and communications, which are applicable

to RMA and its physicians.

108.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

109.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

110.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

**F.  Plaintiff's and Class Members' Expectation of Privacy**

111.    At all times when Plaintiff and Class Members provided their Private Information

to Defendant, they all had a reasonable expectation that the information would remain private and

that Defendant would not share the Private Information with third parties for a commercial

marketing and sales purposes, unrelated to patient care.

**G.  IP Addresses are Personally Identifiable Information**

112.    On information and belief, Defendant also disclosed and otherwise assisted

Facebook and other third parties with intercepting Plaintiff's and Class Members' IP addresses

27

Case ID: 230502846

using the Meta Pixel and other tracking technologies.

113.    An IP address is a number that identifies the address of a device connected to the Internet.

114.    IP addresses are used to identify and route communications on the Internet.

115.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

116.    Facebook tracks every IP address ever associated with a Facebook user.

117.    Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

118.    Under HIPAA, an IP address is Personally Identifiable Information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses.  *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

119.    Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

**H. Defendant Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures**

120.    The sole purpose for Defendant's use of the Meta Pixel and other tracking technology was marketing and profits.

121.    In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook and likely others in the form of enhanced advertising services and more cost-efficient marketing on its platform.

Case ID: 230502846

122.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

123.    By utilizing the Meta Pixel and other trackers, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

### I.   Plaintiff's and Class Members' Private Information Had Financial Value

124.    Plaintiff's data and Private Information has economic value. Facebook regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences and then sells that information to advertising clients.

125.    Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is due to increase; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

126.    In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, Time Magazine described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[57]

127.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who

---

[57] *See* Adam Tanner, How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry, TIME, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.

Case ID: 230502846

compile the data from providers and other health-care organizations and sell it to buyers."[58]

## TOLLING, CONCEALMENT, AND ESTOPPEL

128.    The applicable statutes of limitation have been tolled as a result of RMA's knowing and active concealment and denial of the facts alleged herein.

129.    RMA seamlessly incorporated Meta Pixel and other trackers into its Website and Online Platforms while providing users with no indication that their Website usage was being tracked and transmitted to third parties. RMA knew that its Website incorporated Meta Pixel and other trackers, yet it failed to disclose to Plaintiff and Class Members that their sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook, and likely other third parties, including Google, Microsoft, AppNexus, Hotjar, Arttrk.com, and Trade Desk.

130.    Plaintiff and Class Members could not with due diligence have discovered the full scope of RMA's conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel or any other tracking technology.

131.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. RMA's illegal interception and disclosure of Plaintiff's Private Information has continued unabated through August 2022. What's more, RMA was under a duty to disclose the nature and significance of their data collection practices but did not do so. RMA is therefore estopped from relying on any statute of limitations defenses.

## CLASS ALLEGATIONS

132.    Plaintiff brings this statewide class action on behalf of herself and on behalf of other similarly situated persons.

---

[58] *See* Christina Farr, Hospital Execs Say They are Getting Flooded with Requests for Your Health Data, CNBC, (Dec. 18, 2019 at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

Case ID: 230502846

133.    The statewide Class that Plaintiff seeks to represent is defined as follows:

**All Pennsylvania citizens whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.**

134.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

135.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

136.    Numerosity: Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds or thousands of individuals whose Private Information may have been improperly accessed in the Disclosure, and each Class is apparently identifiable within Defendant's records.

137.    Commonality: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

      a.    whether and to what extent Defendant had a duty to protect Plaintiff's and Class Members' Private Information;

      b.    whether Defendant had duties not to disclose the Plaintiff's and Class Members' Private Information to unauthorized third parties;

      c.    whether Defendant had duties not to use Plaintiff's and Class Members' Private

31

Case ID: 230502846

Information for non-healthcare purposes;

    d.   whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for unauthorized purposes;

    e.   whether Defendant failed to adequately safeguard Plaintiff's and Class Members' Private Information;

    f.   whether and when Defendant actually learned of the Disclosure;

    g.   whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

    h.   whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

    i.   whether Defendant failed to properly implement and configure the tracking software on its Online Platforms to prevent the disclosure of confidential communications and Private Information;

    j.   whether Defendant adequately addressed and fixed the vulnerabilities that permitted the Disclosure to occur; and

    k.   whether Defendant engaged in unfair, unlawful, or deceptive practices by misrepresenting that it would safeguard Plaintiff's and Class Members' Private Information.

138.   <u>Typicality</u>: Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use and incorporation of Meta Pixel and other tracking technology.

139.   <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the

Case ID: 230502846

Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

140.    Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiff has suffered is typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

141.    Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

142.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure

Case ID: 230502846

to afford relief to Plaintiff and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

143.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

144.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

145.    Unless a Class-wide injunction is issued, Defendant may continue in its unlawful disclosure and failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding Disclosure, and Defendant may continue to act unlawfully as set forth in this Complaint.

146.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Class is appropriate.

147.    Likewise, particular issues are appropriate for certification because such claims

Case ID: 230502846

present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

a. whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b. whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

d. whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

e. whether Defendant breached the implied contract;

f. whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g. whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Disclosure;

h. whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiff's and Class Members' Private Information; and

i. whether Plaintiff and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

<u>**COUNT I**</u>
**NEGLIGENCE**

Case ID: 230502846

**(On Behalf of Plaintiff and the Class)**

148.    Plaintiff realleges and incorporates the above allegations as if fully set forth herein.

149.    Defendant owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiff's and Class Members' Private Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Private Information that occurred.

150.    Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiff's and Class Members' Private Information by disclosing and providing access to this information to third parties for the financial benefit of the third parties and Defendant.

151.    Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Private Information to benefit third parties and Defendant. Defendant actively sought and obtained Plaintiff's and Class Members' Private Information.

152.    Private Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiff and Class Members by disclosing their Private Information to third parties. This disclosure was of benefit to third parties and Defendant by way of data harvesting, advertising, and increased sales.

153.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiff and Class Members. This failure actually and proximately caused Plaintiff's and Class Members' injuries.

Case ID: 230502846

154.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, inappropriate advertisements and use of their Private Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

155.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the unauthorized access of their Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused by Defendant's negligence. These injuries are ongoing, imminent, immediate, and continuing.

<u>COUNT II</u>
**INVASION OF PRIVACY—INTRUSION UPON SECLUSION**
**(On Behalf of Plaintiff and the Class)**

156.    Plaintiff realleges and incorporates the above allegations as if fully set forth herein.

157.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via their Website and Online Platforms and the communications platforms and services therein.

158.    Plaintiff and Class Members communicated sensitive PHI and PII—Private Information—that they intended for only Defendant to receive and that they understood Defendant would keep private.

159.    Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiff and Class Members is an intentional

37

Case ID: 230502846

intrusion on Plaintiff's and Class Members' solitude or seclusion and their private affairs and concerns.

160.    Plaintiff and Class Members had a reasonable expectation of privacy given Defendant's representations, and Notice of Privacy Practices. Moreover, Plaintiff and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential. Defendant's disclosure of PHI coupled with PII is highly offensive to the reasonable person.

161.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

162.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

163.    Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of its intrusions upon Plaintiff's and Class Members' privacy.

164.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

165.    Plaintiff also seek such other relief as the Court may deem just and proper.

**<u>COUNT III</u>**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiff and the Class)**

166.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

Case ID: 230502846

167.    As a condition of receiving medical care from Defendant, Plaintiff and the Class provided their Private Information and paid compensation for the treatment received. In so doing, Plaintiff and the Class entered into contracts with Defendant by which Defendant agreed to safeguard and protect such information, in its Notice of Privacy Practices and Online Privacy Policy and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

168.    Implicit in the agreement between RMA and its patients, Plaintiff and the proposed Class Members, was the obligation that both parties would maintain the Private Information confidentially and securely.

169.    RMA had an implied duty of good faith to ensure that the Private Information of Plaintiff and Class Members in its possession was only used only as authorized, such as to provide medical treatment, billing, and other medical benefits from RMA.

170.    RMA had an implied duty to protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses.

171.    Additionally, RMA implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

172.    Plaintiff and Class Members fully performed their obligations under the implied contract with RMA. Defendant did not. Plaintiff and Class Members would not have provided their confidential Private Information to RMA in the absence of their implied contracts with RMA and would have instead retained the opportunity to control their Private Information for uses other than receiving medical treatment from RMA.

173.    RMA breached the implied contracts with Plaintiff and Class members by disclosing Plaintiff's and Class Members' Private Information to an unauthorized third party.

Case ID: 230502846

174.    RMA's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their Private Information in exchange for medical treatment and benefits.

175.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and the Class have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities.

176.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages.

## COUNT IV
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

177.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

178.    This claim is pleaded solely in the alternative to Count III (Breach of Implied Contract).

179.    Plaintiff and Class members conferred a monetary benefit upon Defendant, RMA, in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiff and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

180.    Plaintiff and Class Members would not have used Defendant's services or would have paid less for those services, if they had known that Defendant would collect, use, and disclose their Private Information to third parties.

181.    Defendant appreciated or had knowledge of the benefits conferred upon it by

Case ID: 230502846

Plaintiff and Class members.

182.    As a result of RMA's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

183.    The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members themselves. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

184.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the Disclosure alleged herein.

### COUNT V
### BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and the Class)

185.    Plaintiff realleges and incorporates the above allegations as if fully set forth herein.

186.    A relationship existed between Plaintiff and the Class, on the one hand, and Defendant, on the other, in which Plaintiff and the Class put their trust in Defendant to protect the Private Information of Plaintiff and the Class, and Defendant accepted that trust.

187.    Defendant breached the fiduciary duty that it owed to Plaintiff and the Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the

41

Case ID: 230502846

highest and finest loyalty, and failing to protect, and intentionally disclosing, their Private Information.

188.    Defendant's breach of fiduciary duty was a legal cause of injury-in-fact and damage to Plaintiff and the Class.

189.    But for Defendant's breach of fiduciary duty, the injury-in-fact and damage to Plaintiff and the Class would not have occurred.

190.    Defendant's breach of fiduciary duty contributed substantially to producing the damage to the Plaintiff and the Class.

191.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff and Class Members are entitled to and do demand actual, consequential, and nominal damages, injunctive relief, and all other relief allowed by law.

**<u>COUNT VI</u>**
**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND**
**CONSUMER PROTECTION LAW, 73 PA. STAT. § 20101 *ET. SEQ.* ("UTPCPL")**
**(On Behalf of Plaintiff and the Class)**

192.    Plaintiff realleges and incorporates the above allegations as if fully set forth herein.

193.    Plaintiff, the members of the Class, and Defendant RMA are all "persons" within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. § 201-2(2).

194.    The UTPCPL prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

195.    Under the UTPCPL, "[u]nfair or deceptive acts or practices" include: "[r]epresenting that… services have sponsorship, approval, characteristics, . . . [or] benefits . . . that they do not have," 73 Pa. § 201-2(4)(v); "[r]epresenting that… services are of a particular standard . . . [or] quality . . . if they are of another," *id.* § 201-2(4)(vii); "[a]dvertising…

42

Case ID: 230502846

services with intent not to sell them as advertised," *id.* § 201-2(4)(ix); and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," *id.* § 201-2(4)(xxi).

196.    Defendant's acts, practices, and omissions alleged in this Complaint constitute unlawful, unfair, and deceptive acts and practices under the UTPCPL.

197.    Defendant knew or should have known about the unauthorized Disclosure of Plaintiff's and the Class's Private Information via the Meta Pixel, yet Defendant concealed that information from Plaintiff and the Class.

198.    Defendant engaged in unlawful, unfair, and deceptive acts and practices prohibited by the UTPCPL by, among other things: misrepresenting or omitting material facts to Plaintiff and the Class regarding the adequacy of Defendant's protection of their Private Information, in violation of 73 Pa. Stat. §§ 201-(4)(v), (vii), (ix), and (xxi).

199.    Defendant's acts and omissions and its misrepresentations were intentional, knowing, and undertaken to mislead the public, including Plaintiff and the members of the Class.

200.    Defendant's unlawful, unfair, and deceptive acts and practices were unethical, oppressive, and unscrupulous. These acts and practices caused substantial injury to Plaintiff and members of the Class that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

201.    Defendant possessed exclusive knowledge about the Disclosure of Plaintiff's and the Class Member's Private Information to unauthorized parties via the Meta Pixel to their detriment.

202.    Defendant had a duty to disclose the foregoing to Plaintiff and members of the Class but failed to do so.

Case ID: 230502846

203.    Plaintiff and members of the Class reasonably relied on Defendant to protect and safeguard their Private Information and to promptly and adequately inform them of the unauthorized Disclosure.

204.    Defendant owed Plaintiff and the Class a duty to maintain the privacy and security of Plaintiff's and the Class's Private Information; take proper action to prevent the Disclosure; take proper action following the Disclosure to protect further unauthorized disclosure, release, and theft of Private Information, and promptly inform Plaintiff and members of the Class about the breach.

205.    Plaintiff and members of the Class suffered ascertainable losses of money or property as a result of Defendant's use and employment of methods, acts, or practices declared to be unlawful by 73 Pa. §§ 201-2(2) and 201-(3).

206.    Plaintiff and the Class seek an order enjoining Defendant's unlawful acts and practices and awarding any other just and proper relief available under the UTPCPL including actual or statutory damages, treble damages, and attorneys' fees and costs.

## COUNT VII
**VIOLATION OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT 18 PA. C.S. § 5701, *ET SEQ.* ("WESCA")
(On Behalf of Plaintiff and the Class)**

207.    Plaintiff and Class Members re-allege and incorporate the above allegations as if fully set forth herein.

208.    WESCA defines "Person" as any employee, or agent of the United States or any state or political subdivision thereof, and any individual, partnership, association, joint stock company, trust or corporation. 18 Pa. C.S.A. § 5702.

209.    Defendant constitutes a "person" under WESCA, 18 Pa. C.S.A. § 5702.

Case ID: 230502846

210.    The Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S.A. §§ 5701, 5703(1) ("WESCA") prohibits any person from willfully intercepting, endeavoring to intercept, or procuring of any other person to intercept or endeavor to intercept, any wire, electronic, or oral communication.

211.    WESCA, 18 Pa. C.S.A. § 5702 defines "intercept," as "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. C.S.A. § 5702.

212.    WESCA, 18 Pa. C.S.A. § 5703(2)-(3) also prohibits the disclosure of, or use of, the contents of any wire, electronic, or oral communication, or any evidence derived therefrom, with knowledge that the information was obtained through the interception of a wire, electronic, or oral communication.

213.    WESCA, 18 Pa. C.S.A. § 5741(a) further prohibits the knowing access without authorization of a facility through which an electronic communication is provided or exceeds an authorization to access that facility and obtains, or alters, access to a wire or electronic communication while that communication is in electronic storage.

214.    WESCA, 18 Pa. C.S.A. § 5741, is also violated where, for the purpose of commercial advantage or private commercial gain, a person knowingly accesses without authorization a facility through which an electronic communication service is provided, or exceed access to that facility, and obtains access to a wire or electronic communication while that communication is in electronic storage.

215.    As set forth herein, Defendant knowingly, willfully, and intentionally intercepted and disclosed Plaintiff's and Class Members' electronic communications, without the consent of the Plaintiff and Class Members, using Facebook's and other third parties' tracking devices.

Case ID: 230502846

216.    Defendant knowingly, willfully, and intentionally intercepted Plaintiff's and Class Members' electronic communications for the purpose of disclosing those communications to third parties including Facebook and others without the knowledge, consent, or written authorization of Plaintiff or Class Members.

217.    The devices used in this case, include, but are not limited to:

    a.    to which Plaintiff's and Class Members' communications were disclosed.

    b.    Plaintiff's and Class Members' personal computing devices;

    c.    Plaintiff's and Class Members' web browsers; and

    d.    Plaintiff's and Class Members' browser-managed files.

    e.    Facebook's Pixel, and other tracking technology including Google Tag Manager, Microsoft Clarity, AppNexus, Hotjar, Arttrk.com, and TradeDesk;

    f.    Internet cookies;

    g.    Defendant's computer servers;

    h.    Third-party source code utilized by Defendant; and

    i.    Computer servers of third parties (including Facebook).

218.    Defendant aided in the interception of communications between Plaintiff and Class Members and Defendant that were redirected to and recorded by third parties without the Plaintiff's or Class Members' consent.

219.    WESCA confers a private civil cause of action to any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation thereof against "any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication." 18 Pa. C.S. § 5725(a).

Case ID: 230502846

220.    As a result of Defendant's violations of WESCA, pursuant to 18 Pa. C.S.A. §

5725(a), Plaintiff and the Class Members are entitled to recover actual damages that are not less

than liquidated damages computed at a rate of $100.00 a day for each day of violation or $1,000.00,

whichever is higher; punitive damages; and reasonable attorneys' fees and other litigation costs

reasonably incurred.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, JANE DOE, Individually, and on behalf of all others similarly

situated, prays for judgment as follows:

A.    for an Order certifying this action as a Class action and appointing Plaintiff as Class
Representative and Plaintiff's counsel as Class Counsel;

B.    for equitable relief enjoining Defendant from engaging in the wrongful conduct
complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and
Class Members' Private Information and from refusing to issue prompt, complete
and accurate disclosures to Plaintiff and Class Members;

C.    for equitable relief compelling Defendant to utilize appropriate methods and
policies with respect to consumer data collection, storage, and safety and to
disclose with specificity the type of Private Information compromised and
unlawfully disclosed to third parties;

D.    for equitable relief requiring restitution and disgorgement of the revenues
wrongfully retained as a result of Defendant's wrongful conduct;

E.    ordering Defendant to pay for not less than three years of credit monitoring
services for Plaintiff and the Class;

F.    for an award of actual damages, compensatory damages, statutory damages, and

47

Case ID: 230502846

statutory penalties, in an amount to be determined in excess of $50,000.00, as allowable by law, including pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 20101, *et seq.* ("UTPCPL"), and the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S.A. §§ 5701, *et seq.* ("WESCA");

G.     for an award of punitive damages, as allowable by law;

H.     for an award of attorneys' fees under the UTPCPL, WESCA, the common fund doctrine, and any other applicable law;

I.     costs and any other expenses, including expert witness fees incurred by Plaintiff in connection with this action;

J.     pre- and post-judgment interest on any amounts awarded;

K.     trial by jury on all issues so triable; and,

L.     such other and further relief as this court may deem just and proper.

Dated: May 25, 2023                    Respectfully submitted,

**SALTZ MONGELUZZI & BENDESKY P.C.**

By: */s/ Elizabeth A. Bailey*
Elizabeth A. Bailey (Identification No. 316689)
52nd Floor
1650 Market Street
Philadelphia, Pennsylvania 19103
(215) 496-8282
ebailey@smbb.com

**COHEN & MALAD, LLP**
Lynn A. Toops (*Pro Hac Vice* forthcoming)
Mary Kate Dugan (*Pro Hac Vice* forthcoming)
One Indiana Square, Suite 1400

Case ID: 230502846

Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
mdugan@cohenandmalad.com

**STRANCH, JENNINGS & GARVEY, PLLC**
J. Gerard Stranch, IV (*Pro Hac Vice* forthcoming)
Andrew E. Mize (*Pro Hac Vice* forthcoming)
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

**TURKE & STRAUSS, LLP**
Samuel J. Strauss (*Pro Hac Vice* forthcoming)
Raina C. Borelli (*Pro Hac Vice* forthcoming)
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com
raina@turkestrauss.com

*Attorneys for Plaintiff and the Proposed Class*

49